

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAHNEE M., | Case No.:  22-cv-00257-BEN-JLB |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION RE: PLAINTIFF'S MERITS BRIEF** |
| v. | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | **[ECF Nos. 18, 20]** |

This Report and Recommendation is submitted to the Honorable Roger T. Benitez, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

On February 25, 2022, plaintiff Tahnee M. ("Plaintiff") filed a Complaint pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits.  (ECF No. 1; AR 151–52.)

///

///

Now pending before the Court and ready for decision is Plaintiff's merits brief. (ECF No. 18.)  The Commissioner filed an opposition.  (ECF No. 20.)[1]  Plaintiff filed a reply.  (ECF No. 21.)  For the reasons set forth herein, the Court **RECOMMENDS** that Plaintiff's merits brief be **DENIED**, and that judgment be entered affirming the decision of the Commissioner.

## I.      PROCEDURAL BACKGROUND

On or about January 27, 2020, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability since August 20, 2019.  (Certified Administrative Record ["AR"] 151–52, 15.)  After her applications were denied initially and upon reconsideration (AR 79–84, 86–91), Plaintiff requested an administrative hearing before an administrative law judge ("ALJ") (AR 92–93).  An administrative hearing was held on March 3, 2021.  (AR 29–51.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a vocational expert ("VE").  (AR 29–51.)

As reflected in his March 22, 2021, hearing decision, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from her alleged onset date through the date of the decision.  (AR 12–28.)  The ALJ's decision became the final decision of the Commissioner on January 31, 2022, when the Appeals Council denied Plaintiff's request for review.  (AR 1–6.)  This timely civil action followed.

## II.     SUMMARY OF THE ALJ'S FINDINGS

In rendering his decision, the ALJ followed the Commissioner's five-step sequential evaluation process.  *See* 20 C.F.R. § 404.1520.  At Step One, the ALJ found that Plaintiff

---

[1]      The Court construes Plaintiff's improperly filed motion for summary judgment as her merits brief, and the Commissioner's improperly filed cross-motion for summary judgment as her opposition to Plaintiff's merits brief.  *See* CivLR 7.1(e)(6)(e); ECF No. 12 at 2.

2

had not engaged in substantial gainful activity since August 20, 2019, her alleged onset date.  (AR 17.)

At Step Two, the ALJ found that that Plaintiff had the following severe impairments: bipolar disorder; attention deficit hyperactivity disorder ("ADHD"); and history of lumbar strain/sprain.  (AR 17.)  The ALJ found that these impairments significantly limit her ability to perform basic work activities.  (AR 17.)  The ALJ also found that Plaintiff's substantive abuse is not severe.  (AR 17.)

At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Commissioner's Listing of Impairments.  (AR 18.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c), with the following additional limitations: Plaintiff is limited to "routine, noncomplex tasks" and "occasional interaction with the public."  (AR 19.)

For purposes of his Step Four determination, the ALJ adduced and accepted the VE's testimony that a hypothetical person with Plaintiff's vocational profile would not be able to perform the requirements of Plaintiff's past relevant work.  (AR 22.)  Accordingly, the ALJ found that Plaintiff was unable to perform her past relevant work as actually performed or as generally performed.  (AR 22–23.)

The ALJ then proceeded to Step Five of the sequential evaluation process.  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile could perform the requirements of occupations that existed in significant numbers in the national economy (*i.e.*, laundry laborer, janitorial, warehouse worker), the ALJ found that Plaintiff was not disabled.  (AR 23–24.)

///

///

///

///

## III.   DISPUTED ISSUES

As reflected in Plaintiff's merits brief, the disputed issues that Plaintiff is raising as the grounds for reversal and remand are as follows:

1.   Whether the ALJ breached his duty to develop the record (ECF No. 18-1 at 8–9);

2.   Whether the ALJ provided clear and convincing reasons to reject Plaintiff's symptom testimony (*id.* at 15–16);

3.   Whether the ALJ properly assessed the "paragraph B" criteria (*id.* at 11–13);

4.   Whether the ALJ properly assessed the "paragraph C" criteria (*id.* at 8, 10–11);

5.   Whether the ALJ properly assessed Plaintiff's RFC (*id.* at 13–14); and

6.   Whether the ALJ met his burden of proof at Step Five (*id.* at 14–15).

## IV.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 575–76 (9th Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. *Green v. Heckler*, 803 F.2d 528, 529–30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).

///

///

///

## V.    FACTUAL BACKGROUND[2]

### A.    Plaintiff's Medical Records

Plaintiff filed an application for disability insurance benefits in part due to bipolar disorder, anxiety, and depression.  (AR 167.)  Plaintiff's medical record includes regular treatment notes from Plaintiff's sessions with Anil S. Patel, M.D. and Heidi H. Hokaj, MA, MFT at Psychiatric Centers at San Diego from March 2010 to February 2021.[3]  (AR 372–899, 916-991, 1024–1142.)  The treatment notes first mention Plaintiff's anxiety disorder in March 2010 (AR 899), her ADHD diagnosis in July 2010 (AR 898), and her Bipolar II diagnosis in October 2010 (AR 884).

Over the years, Plaintiff was prescribed and took various medications to address her mental health symptoms.  These include Xanax, Seroquel, Adderall, Trazadone, Vraylar, Flexeril, Alprazolam, Vyvanse, Trileptal, Latuda, Lamictal and Cymbalta.  (*E.g.*, AR 376, 485, 552, 662, 869, 888, 892, 898, 899, 1025.)

Plaintiff also availed herself of treatment, classes, and group sessions at Aurora Mental Health and Recovery.  Specifically, Dr. Patel referred Plaintiff to the Aurora intensive outpatient program in January 2011 and again in January 2012.  (AR 890, 895.) In mid-2012, Plaintiff attended free groups and took classes at Aurora.  (AR 876–78.)  In September 2012, Dr. Patel referred Plaintiff to the Aurora inpatient treatment program to get sober and stay sober, as well as to stabilize her mood.  (AR 875.)  In May 2016, Dr. Patel again referred Plaintiff to the Aurora intensive outpatient program.  (AR 696.)

///

---

[2]    Because Plaintiff does not contest the ALJ's findings with respect to her physical impairments, the Court will only address Plaintiff's mental impairments.

[3]    In August 2019, Plaintiff indicated in a treatment note that she was seeing a new psychiatrist named Wanda through NCHS but would be transferred to UCSD.  (AR 463.) Wanda is mentioned again as a provider in treatment notes in June, July, September, and November 2020.  (AR 926, 930, 1079, 1108, 1129.)  Plaintiff did not request and the Commissioner did not receive any treatment notes from Wanda.

Throughout the years, Plaintiff reported success with her medications and mental health treatment (*e.g.*, AR 539, 583, 587, 596, 615, 621, 754, 768, 795, 866), but at times also reported feeling paranoid (*e.g.*, 554, 565, 795, 883, 892, 894), experiencing mood swings including mania and depression (*e.g.*, 497, 757, 764, 874, 878, 888, 891), having social stress and anxiety (*e.g.*, AR 750), and feeling impulsive (*e.g.*, AR 877).   She sometimes had passive suicidal thoughts. (*E.g.*, AR 874, 875.)

As of January 18, 2019, Plaintiff was six weeks pregnant and planning to go off her medications. (AR 475.)  To deal with going off her medications, Plaintiff planned on deep breathing, talking walks, exercising, and using squishy balls.  (AR 475.)  Her mood on January 18 was assessed as anxious and irritable and her attitude towards the provider was noted to be anxious and mistrustful.  (AR 476.)  After Plaintiff went off her medications, she reported anxiety and not sleeping well.  (AR 465, 469.)  She also reported moderate difficulty in maintaining attention after going off Adderall.  (AR 469.)  On January 21, Plaintiff had a generally normal mental status examination, but her mood was assessed as anxious.  (AR 469–70.)  On February 1, Plaintiff reported that she was doing better with her anxiety and her mental status examination was generally normal.  (AR 465.)  She was assessed with a euthymic mood.  (AR 465.)

On August 9, Plaintiff was thirty-three weeks pregnant.  (AR 463.)  On August 9 and 23, she had a generally normal mental status examinations, but her mood was assessed as anxious.  (AR 460, 463.)  Plaintiff had her baby on August 25, 2019.  (AR 454.)  She was off all medications during the pregnancy, but she started taking Vraylar and Xanax after giving birth.  (AR 452, 454.)  Plaintiff alleges disability beginning August 20, 2019, five days before she gave birth.  (AR 15.)

As of late September 2019, Plaintiff was feeling better on her current medications. (AR 446.)  In September and October 2019, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as anxious, irritable, depressed, overwhelmed, crying easily, and euthymic.  (AR 429, 432, 435, 439, 443, 446, 449, 452, 455–56.)

In November 2019, Plaintiff was feeling emotionally drained and as if she were crashing halfway through the day. (AR 426.) She thought she might need to change her medications to the extended-release versions. (AR 426.) As of mid-November 2019, Plaintiff was feeling stable most days with her current medications. (AR 415.) By late November, however, she was feeling overwhelmed, forgetting appointments, late for group, and not utilizing her available resources. (AR 412.) In December 2019, Plaintiff was experiencing a lot of anxiety, fear, guilt, and tiredness. (AR 404.) She no longer felt the Adderall was working for her ADHD and was hoping to switch to Vyvanse because she was falling asleep during the day. (AR 404.) In November and December 2019, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as emotionally exhausted, anxious, irritable, constricted, and euthymic. (AR 401, 404, 408, 412, 418, 421–22, 426.)

In January 2020, Dr. Patel noted that Plaintiff was continuing to exhibit significant mood instability and irritability, agitation, depression, anxiety, and an inability to cope. (AR 396.) Despite a generally normal mental status examination on January 6, her mood was assessed as anxious, and her affect as constricted and labile. (AR 398.) Plaintiff felt her medications were only partially effective. (AR 396.) At the time, she was taking Xanax, Vyvanse, and Vraylar. (AR 398.) During her other appointments in January 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as depressed, irritable, anxious, and euthymic. (AR 388, 391, 394.)

In early February 2020, Plaintiff reported doing well overall, but had been very irritable and did not really want to be around anyone. (AR 385.) Plaintiff communicated to her new husband that when she has "bipolar" moments, she needs to be alone. (AR 388, 394.) By mid-February 2020, Plaintiff reported she was unable to function with her mood, her mood was "all over the place," and she was not feeling like herself. (AR 379.) Plaintiff felt like the Vraylar was only partially effective. (AR 379.) She changed her medication to Latuda. (AR 377.) On February 14, 2020, Plaintiff reported having a very bad fight

with her husband during which she pushed him and called him names.  (AR 377.)  In February 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as depressed, irritable, very tired, and euthymic. (AR 377, 381, 385.)

In March 2020, Plaintiff was debating going back to work and getting off disability. (AR 990.)  She felt Latuda, her new medication, was helping with her depression, but she still had manic symptoms and wanted to be back on a mood stabilizer and antidepressant. (AR 984, 991.)  Dr. Patel prescribed Lamictal.  (AR 988.)  A week later, Plaintiff indicated that she would not be going back to work because she felt like her moods were not consistent enough.  (AR 982.)  She was irritable and wanted to be left alone.  (AR 982.) On March 27, Plaintiff reported having a tough time staying motivated and keeping structure.  (AR 975.)  Plaintiff was very irritable and agitated and believed it might be the Adderall.  (AR 975.)  She was having a lot of anxiety, but the Xanax was still helping.  (AR 975.)  Plaintiff was dealing with her anxiety by walking daily to get fresh air and a little exercise.  (AR 972.)  In early April 2020, Plaintiff reported having a stable mood.  (AR 965.)  Plaintiff felt that the Lamictal was helping her mood and she was less depressed. (AR 965.)  A week later, Plaintiff cut her Lamictal dose in half.  (AR 962.)  She reported that some days she did not need any Xanax, and some days she needed three.  (AR 962.) She stopped using Adderall but then found it difficult to be motivated to do things.  (AR 962.)  On April 18, Plaintiff again reported a fight with her husband during which she hit him.  (AR 958.)  She no longer felt like her medication was working and she had no motivation.  (AR 959.)

In March and April 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as anxious, irritable, depressed, and euthymic.  (AR 954, 958, 962, 967, 971, 975, 978, 981, 986, 990.)  On April 18, despite a generally normal mental status examination, Plaintiff's mood was assessed as depressed, anxious, and irritable, her affect was assessed as flat, and her speech was assessed as slow. (AR 958.)

In May 2020, Plaintiff reported that her moods had been okay, she had more energy, and she was thinking of going back to work in August. (AR 951.) Plaintiff started taking Trazadone, which helped with her sleep and mood. (AR 942.) In June 2020, Plaintiff felt like her moods were fluctuating constantly and like she was a light switch turning off and on. (AR 934.) She missed two doctor's appointments, one because she was in a "bad space." (AR 933.) Plaintiff expressed frustration with her medications because she was feeling very "off" and restless. (AR 929.) At her doctor's recommendation, she was jogging every morning. (AR 930.) In late June 2020, Plaintiff reported feeling very restless, constantly moving back and forth, but also tired and yawning. (AR 926.) She had stopped taking Adderall and wanted to go off her other medications. (AR 926.) She later had her Lamictal dosage lowered and felt better. (AR 921.) Plaintiff continued to jog and exercise. (AR 922, 926.) In May and June 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as irritable, restless, anxious, depressed, angry, and euthymic. (AR 921, 925, 929, 933, 938, 942, 947, 950, 1140.)

In July 2020, Plaintiff stopped taking Trazodone because it was not helping. (AR 1130.) She also went back to work a few nights a week at a group home. (AR 1122, 1125.) She started taking the Adderall again, but she was no longer sure if the Lamictal was working because her moods were up and down. (AR 1118, 1123.) Plaintiff's husband reportedly felt that her mood was not stable and did not like the current medication situation. (AR 1118.) He was also concerned that she was taking opioids (Norco) due to dental work. (AR 1118–19.) In August 2020, Plaintiff stopped taking the Lamictal because she did not like the agitation it was causing. (AR 1114.) In July and August 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as irritable, anxious, restless, and euthymic. (AR 1114, 1118, 1122, 1125, 1128, 1131–32, 1136.)

In September 2020, Plaintiff started taking the Trazadone again to help her sleep, but she would have a little bit of blurry vision when she woke up. (AR 1108.) She was

still taking the Latuda and Xanax as needed.  (AR 1103.)  She reported not having a manic episode in a while.  (AR 1103.)  In October 2020, Plaintiff was doing well overall, with some restlessness and anxiety.  (AR 1094.)  She felt better when she decreased the Latuda.  (AR 1089, 1094.)  On October 22, Plaintiff reported not needing a Xanax in weeks.  (AR 1091.)  In November 2020, Plaintiff reported doing well for the most part, believing that she was in "more of an up mode" at the time.  (AR 1082.)  In December 2020, Plaintiff relapsed on methamphetamines and felt out of control.  (AR 1072.)  Upon taking methamphetamines, she was manic. (AR 1070, 1072.)  In September, October, November, and December 2020, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as anxious, irritable, angry, euthymic, and depressed.  (AR 1059, 1063, 1066, 1069–70, 1073–74, 1078, 1082, 1087, 1090–91, 1094, 1099, 1103, 1107, 1111.)

Plaintiff continued to work in early 2021.  In January 2021, all of Plaintiff's mental status examinations were deemed generally normal, but her mood was alternately assessed as angry, irritable, anxious, and depressed.  (AR 1038, 1042, 1046, 1051, 1055.)  On January 12, Dr. Patel assessed Plaintiff's mood as depressed and anxious and her affect as constricted.  (AR 1051.)

Plaintiff took a leave of absence from work in early February 2021 because she was feeling overwhelmed.[4]  (AR 1034.)  On February 10, despite a generally normal mental status examination, Dr. Patel assessed Plaintiff's mood as depressed and her affect as constricted.  (AR 1029–30.)  He added Cymbalta to her medication regimen and noted that he would consider Depakote for her bipolar disorder if there was no response to the Cymbalta.  (AR 1032.)  Plaintiff also agreed to go to the hospital if she was in crisis.  (AR 1032.)  On February 11, Plaintiff reported having three panic attacks the day before.  (AR 1025.)  She told Dr. Patel that she needed four Xanax to get through the day, but the

_____

[4]      As of March 3, 2021, the date of her administrative hearing, Plaintiff had not returned to work and testified that she was "unable to work."  (AR 34.)

treatment notes reflect that she "needs to limit it to [three] per day." (AR 1025.)  Plaintiff started the Cymbalta and was already feeling less anxious and restless.  (AR 1025.)  On February 11, Plaintiff's mental status examination was generally normal, but her mood was assessed as depressed and anxious.  (AR 1025.)

### B.   Plaintiff's Hearing Testimony

At the hearing on March 17, 2021, Plaintiff testified that she has been having problems since she was 15 years old.  (AR 38.)  Plaintiff testified that she has been to Aurora inpatient about five times.  (AR 45.) She has also gone to Aurora outpatient about three or four times.  (AR 45.)

When Plaintiff's attorney asked her to describe her mood disorder, Plaintiff testified as follows:

> I – for the past couple of years, I am manic for maybe a week, and then, I go in a low for about three weeks.  And I'm so depressed, I can't focus.  I kind of go delusional.  I can't sleep.  The sleeping aids they gave me don't help, they make my vision blurry.  I just – I can't focus.  I'm a – I start crying.  I get scared to leave the house.  My panic attacks have started again.  I just – I feel like I'm not in control anymore.
>
> . . .
>
> It – it's been like this for the past couple of years, and it's getting worse.

(AR 42.)  Plaintiff also testified to memory loss.  (AR 45.)

When Plaintiff is manic, she testified that she will "start cleaning everything" and will "want to call everybody on the phone . . . [and] want to go spend all my money[.]" (AR 42.)  She tries to buy a car and will call her husband, her mom, and her therapist.  (AR 42.)  Plaintiff will only be "manic for about a week," but is "normally depressed."  (AR 43.)  When Plaintiff is depressed, it is "very, very hard for [her] to get out of bed" and she "can't think straight."  (AR 43.)  She will be in her head, thinking too much, and her mind will start racing.  (AR 43–44.)  When Plaintiff tries to talk herself out of it, she starts getting panic attacks.  (AR 43.)  Plaintiff also wants to sleep all day, mopes around, and cries all the time.  (AR 43.)

Plaintiff testified she was taking Xanax, Latuda, Adderall, Percocet, and Cymbalta and was not aware of any side effects.  (AR 33, 44.)  She calms her racing mind by putting on music and reading devotional books.  (AR 44.)  Plaintiff testified that she gets paranoid sometimes and believes it is associated with her anxiety.  (AR 44.)  She will get scared to leave the house and thinks people are following her.  (AR 45.)  Although she tries to talk herself out of it, she cannot always do it.  (AR 45.)

Plaintiff further testified that she "was in a manic" state on November 23, 2020, feeling stressed out, overwhelmed, depressed, and all over the place.  (AR 33.)  Her friend offered her some methamphetamine, which she used.  (AR 33.)  At the time of the hearing on March 17, 2021, Plaintiff testified she had not done any drugs for over 90 days.  (AR 33.)  Plaintiff testified that she lives with her husband, one of her children, and two of her husband's children.  (AR 32–33.)  Plaintiff also testified that although she does not physically attack her husband, she has a "problem with throwing stuff."  (AR 46.)

Plaintiff stopped working on August 17, 2019.  (AR 167.)  She started working again at a group home two overnights a week in or around July/August 2020, but was unable to continue working because she could not "keep [her]self together" and could not "focus at work" because she was "all over the place."  (AR 34.)

### C.    Plaintiff's Function Report

In a Function Report, dated February 13, 2020, Plaintiff stated that she is limited in her ability to work because she gets so low that she cannot get out of bed to go to work. (AR 179.)  Her mental illness puts her in moods of anger to where she lashes out at others. (AR 179.)  She stated that she has been this way her whole life.  (AR 180.)  When she is depressed, she does not feel like dressing, bathing, or caring for her hair.  (AR 180.)  Some days she will sleep all day and, other days, she will not sleep at all.  (AR 180.)  She does not do a lot of house or yard work because she gets overwhelmed.  (AR 182.)  She will do the laundry and dishes, but it will sometimes take her all day.  (AR 181.)  She needs help and encouragement to complete daily tasks and reminders to take her medications and take care of her personal needs.  (AR 181.)  She drives and takes her kids to school but needs

her friends to accompany her when she goes shopping.  (AR 182.)  Plaintiff can feed her kids and animals and handle money, but she spends too much money.  (AR 180, 182–183.) On a daily basis, Plaintiff spends approximately thirty to forty-five minutes preparing frozen meals.  (AR 181.)

Plaintiff further stated that she is social and has friends.  (AR 183.)  Her hobbies include watching TV, shopping, coloring, and talking to her friends.  (AR 183.)  When she is depressed, she will lay on the couch and watch TV all day.  (AR 180, 183.)  She has to be forced to go places.  (AR 184.)  However, Plaintiff goes to church every Sunday.  (AR 183.)  When Plaintiff "gets [her] lows," she lashes out and pushes and yells.  (AR 184.) She does not handle stress well and hates change.  (AR 185.)  Change causes her to lash out.  (AR 185.)  She has been fired or laid off from almost every job because of her illness. (AR 185.)  Plaintiff's condition affects her memory, concentration, and her ability to complete tasks, understand, and get along with others.  (AR 184.)

In a questionnaire dated December 16, 2020, Plaintiff stated that she had been working as a caregiver since August 2020, and she was taking the medications Xanax, Latuda, Adderall, and Percocet.  (AR 253.)

### D.    Opinion Evidence

At the initial level, State Agency consultant G. Rivera-Miya M.D.,[5] conducted a mental RFC, dated March 19, 2020, evaluating the period from August 20, 2019, to August 19, 2020.  (AR 58–61.)  Dr. Rivera-Miya opined that Plaintiff has no understanding or memory limitations, but she does have sustained concentration and persistence limitations.  (AR 59.)

///

---

[5]    The ALJ identifies Joseph Duckwall, M.D. as the State Agency consultant who opined on Plaintiff's mental limitations at the initial level.  (AR 18, 21.)  However, it appears to the Court and the Commissioner that only Dr. Rivera-Miya opined on Plaintiff's mental limitations.  (*See* ECF No. 20 at 7 n. 4.)

13

With respect to sustained concentration and persistence limitations, Dr. Rivera-Miya opined that Plaintiff was "moderately limited" in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 59–60.)  Dr. Rivera-Miya further opined that Plaintiff was "not significantly limited" in her abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, and make simple work-related decisions.  (AR 59.)  Dr. Rivera-Miya further explained that Plaintiff was "[a]ble to sustain concentration and persistence sufficient to complete simple one to two step tasks for routine intervals in a typical work environment."  (AR 59.)

With respect to social interaction limitations, Dr. Rivera-Miya opined that Plaintiff would be "moderately limited" in her abilities to interact appropriately with the general public and accept instructions and respond appropriately to criticism from supervisors. (AR 59–60.)  Dr. Rivera-Miya further opined that Plaintiff was "not significantly limited" in her abilities to ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (AR 60.)  Dr. Rivera-Miya further explained that Plaintiff was "[a]ble to interact appropriately with others in a superficial manner in an unskilled setting."  (AR 60.)

Dr. Rivera-Miya initially opined that Plaintiff has no adaption limitations, as she "[c]an manage herself, adapt to changes and avoid hazards in a routine work environment." (AR 60.)  However, Dr. Rivera-Miya later suggested that Plaintiff should avoid hazards. (AR 60.)

In conclusion, Dr. Rivera-Miya opined that Plaintiff is "capable of carrying out simple one to t[wo] step tasks in a routine work environment with no more than occasional

contact with the general public."  (AR 60.)  The "evidence does not support ongoing marked psych limitations," as Plaintiff "is able to sustain at unskilled work for 40 hr/wk, work with coworker/supervisors and avoid hazards."  (AR 60.)  However, Plaintiff "would function best with limited public contact."  (AR 60.)

Dr. Rivera-Miya also conducted a Psychiatric Review Technique and evaluated Plaintiff under Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  (AR 56.)  With respect to the "paragraph B" criteria, Dr. Rivera-Miya opined that Plaintiff had only mild limitations in her ability to understand, remember, or apply information, but had moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (AR 56–57.)  Dr. Rivera-Miya further opined that the evidence did not establish the presence of the "paragraph C" criteria.  (AR 57.)

At the reconsideration level, State Agency consultant Pamela Hawkins, Ph.D., conducted a mental RFC, dated July 17, 2020, evaluating the period from August 20, 2019, to August 19, 2020.  (AR 71–73.)  Dr. Hawkins' mental RFC did not differ from that of Dr. Rivera-Miya.  (AR 71–73.)  She opined that the prior determination should be adopted. (AR 73.)  Dr. Hawkins also agreed with Dr. Rivera-Miya's findings when conducting the Psychiatric Review Technique.  (AR 69–70.)

The State Agency consultative examiners reviewed medical reports from Scripps Health, dated January 1, 2010, to June 2, 2020 (Exhibits 1F, 3F, 4F), and treatment records from Dr. Patel (Psychiatric Centers at San Diego), dated March 18, 2010, to February 14, 2020 (Exhibit 2F), as well as two function reports and a work history report. (AR 66–68.)  It appears the State Agency consultative examiners did not review any records from Dr. Patel after February 2020 or Scripps Health after June 2020, which includes Exhibits 5F, 6F, and 7F, consisting of approximately 227 pages of records.  (*See* AR 55, 68.)

///

///

## VI.   DISCUSSION

### A.   The ALJ Had No Further Duty to Develop the Record

#### 1.   Parties' Arguments

Plaintiff argues that the ALJ based his findings on an incomplete record.  (ECF No. 18-1 at 9.)  She argues that the record contains no mental evaluations from any treating physician or consulting examiner and no records from Plaintiff's psychiatric commitments. (*Id.*)  Plaintiff argues that the ALJ could have sent Plaintiff to a consultative examiner, had a mental expert at the hearing, or subpoenaed Plaintiff's treating psychiatrist and psychotherapist for further clarification.  (*Id.*)  Plaintiff argues that the ALJ instead cherry picked from Plaintiff's progress notes in order to support his finding of non-disability.  (*Id.*) Plaintiff notes that the ALJ's duty to develop the record is especially important in cases of mental impairment.  (*Id.*)

The Commissioner argues in response that "the agency properly discharged its duty to develop the record by, among other efforts, subpoenaing all of the doctors, healthcare professionals, hospitals, and clinics that Plaintiff identified as having provided (or planning to provide) treatment; sending Plaintiff and her attorney various questionnaires specifically asking her whether she had any hospitalizations during the alleged disability period; having two psychiatric consultants review Plaintiff's medical records and opine as to her mental RFC; interviewing Plaintiff over the telephone; and holding a merits hearing during which Plaintiff had the opportunity to present evidence and testify as to the bases for her [disability insurance benefits] application."  (ECF No. 20 at 9.)  The Commissioner further argues that Plaintiff's argument that the ALJ had a duty to obtain a mental evaluation from her treating physicians or a consultative examiner is unpersuasive, as Plaintiff bears the burden of establishing disability and nothing requires the ALJ to obtain a consultative examination under any circumstances.  (*Id.* at 11.)

#### 2.   Legal Standard

The ALJ has a special duty to fully and fairly develop the record and to ensure that the claimant's interests are considered even when the claimant is represented by counsel.

*See Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). "In cases of mental impairments, this duty is especially important." *DeLorme*, 924 F.2d at 849; *see also Tonapetyan*, 242 F.3d at 1150 ("The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests."). However, an ALJ's duty to further develop the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001).

Because it is a claimant's burden to present evidence in support of her alleged disability, the mere absence of a report from a treating or examining physician does not give rise to a duty to develop the record. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *see also* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence thereof as the Commissioner of Social Security may require."). In addition, "[t]he mere existence of medical records post-dating a state agency physician's review does not in and of itself trigger a duty to further develop the record." *Stivers v. Saul*, No. 1:19-cv-01110-BAM, 2021 WL 1193794, at *8 (E.D. Cal. Mar. 30, 2021) (citing *Charney v. Colvin*, No. 13-cv-7080 JC, 2014 WL 1152961, at *7 (C.D. Cal. Mar. 21, 2014), *aff'd*, 647 F. App'x 762 (9th Cir. 2016)).

When the duty to develop the record is triggered, an ALJ may discharge the duty in several ways, including by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Tonapetyan*, 242 F.3d at 1150 (citing *Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998)); *see also* 20 C.F.R. § 404.1520b (when the record is insufficient, an ALJ may recontact a medical source, request additional existing evidence, order a consultative examination, or ask for more information). Ordering a consultative exam is another way an ALJ may fulfill this duty. *Reed v.*

*Massanari*, 270 F.3d 838, 841 (9th Cir. 2001); *see also* 20 C.F.R. § 404.1519. As some courts have persuasively observed, "[t]he ALJ does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment." *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (citations omitted).

### 3.   Analysis

Plaintiff first argues that the record is incomplete because it does not contain any records of Plaintiff's psychiatric commitments. (ECF No. 18-1 at 9.) As set forth above, Aurora is mentioned several times in Plaintiff's medical records as a place to which Plaintiff was referred once for inpatient and three times for outpatient mental health treatment. (*See, e.g.*, AR 696, 875, 876, 882, 895.)[6] During the hearing, Plaintiff stated that she has been to "Aurora in-patient about five times" and to "Aurora outpatient about three or four times." (AR 45.) The record does not contain any records from Aurora. However, during the hearing, when the ALJ asked Plaintiff's counsel if there was any additional medical evidence available, he responded, "No, the record is complete." (AR 31.)

Based on the foregoing, the Court finds that the ALJ's duty to develop the record further was not triggered by the lack of records from Aurora. The ALJ satisfied his duty with respect to those records by asking if there was additional evidence available and counsel affirming that the record was complete. Although the Aurora records might have provided a more complete longitudinal picture of Plaintiff's mental health, the ALJ appropriately relied on counsel's response here. The last mention of Aurora in Plaintiff's

---

[6]   Although the Commissioner suggests that Plaintiff was referred to Aurora for drug and alcohol rehabilitation and not for mental health treatment (ECF No. 20 at 11), the May 2016 treatment note referring Plaintiff to Aurora discusses recent mental health issues and not alcohol or drug issues (AR 694–97). The September 2012 treatment note referring Plaintiff to Aurora does refer to sobriety as one of her goals, but another goal was to "stabilize her mood further." (AR 875.)

medical record was May 24, 2016, more than three years before Plaintiff's alleged onset date of August 20, 2019.[7]  *See* 20 C.F.R. § 404.1512(b)(1) (the Commissioner has the responsibility to develop a complete medical history covering "at least the 12 months preceding the month in which [a claimant] file[s] [an] application").  Therefore, even though the ALJ was on notice of the existence of such records, under these circumstances, the Court cannot conclude that he was required to obtain them in order to properly fulfill his responsibilities.

Plaintiff next argues that the ALJ failed to discharge his duty to develop the record because the record contains no mental evaluations from any treating or examining physicians.  (ECF No. 18-1 at 9.)  However, the mere absence of a report from a treating or examining physician does not give rise to a duty to develop the record.  *Bayliss*, 427 F.3d at 1217.  Moreover, the Social Security Administration ("SSA") is not required to obtain a consultative examination for every claimant.  *Reed*, 270 F.3d at 842.  The SSA "has broad latitude in ordering a consultative examination."  *Id.* (quoting *Diaz v. Sec'y of Health and Human Servs.*, 898 F.2d 774, 778 (10th Cir. 1990)).  Here, the ALJ had opinions from two State Agency consultants that were based on a review of Plaintiff's submitted mental health records covering a period of over ten years, from January 2010 to June 2020.  As such, the Court concludes that the ALJ did not err by failing to obtain a consultative examination or have a mental expert at the hearing.

Plaintiff further argues that the ALJ could have subpoenaed Plaintiff's treating psychiatrist and psychotherapist for further clarification.  (ECF No. 18-1 at 9.)  However, the ALJ does not express at any point that he felt the record was insufficient or ambiguous, or needed clarification.  "Given that the ALJ had years of [Plaintiff's] mental health records and multiple opinions from non-examining psychiatrists to inform [his] decision, [the duty

---

[7]      The ALJ also sent Plaintiff a questionnaire asking if she had been hospitalized during the prior four years.  (AR 253.)  On December 16, 2020, Plaintiff completed and signed the questionnaire and did not list any hospitalizations.  (AR 253; *see also* AR 242.)

to develop the record] was not triggered." *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020); *see also Bayliss*, 427 F.3d at 1217 (concluding the ALJ "did not have a duty to recontact the doctors" when the ALJ, "with support in the record, found the evidence adequate to make a determination regarding [the claimant's] disability").

Lastly, Plaintiff argues that the ALJ's failure to obtain the Aurora records was in error because they constitute evidence supporting the "paragraph C" criteria. (ECF No. 18-1 at 10.) At Step Three, an ALJ determines whether a claimant's mental impairment "meets or equals one of [the SSA's] listings in appendix 1 . . . and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. § 404.1509 (to meet the duration requirement, an impairment "must have lasted or must be expected to last for a continuous period of at least 12 months"). In order to meet the relevant listings, a claimant must satisfy the criteria in "paragraph A" of the listings, which medically substantiate the presence of a mental disorder, <u>and</u> the criteria in "paragraph B" <u>or</u> "paragraph C," which describe the functional limitations associated with the disorder which are incompatible with the ability to work. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

To meet the "paragraph C" criteria, Plaintiff's mental disorder must be "serious and persistent," which is defined as "a medically documented history of the existence of the disorder over a period of at least 2 years" with evidence of both: (C1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder"; and (C2) "[m]arginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *Id.*

///
///
///
///
///

Here, Plaintiff has not demonstrated the necessity of the Aurora records to substantiate the C1 and C2 criteria.[8] As noted above, Aurora is last mentioned in Plaintiff's medical record on May 24, 2016, more than three years before Plaintiff's alleged onset date of August 20, 2019. (AR 696.) The Court finds that the ALJ was not required to obtain these records in order to properly analyze the "paragraph C" criteria.

For the foregoing reasons, the Court finds that the ALJ did not fail to discharge his duty to further develop the record.

**B.  The ALJ Did Not Err in Evaluating Plaintiff's Symptom Testimony**

Plaintiff argues that the ALJ failed to provide clear and convincing reasons for rejecting Plaintiff's subjective symptom testimony. (ECF No. 18-1 at 15–16.) Plaintiff specifically contends that the ALJ did not discuss how Plaintiff's treatment records and other evidence conflicts with Plaintiff's symptom testimony. (*Id.* at 16.) In response, the Commissioner argues that the ALJ properly evaluated Plaintiff's symptom testimony. (ECF No. 20 at 16–18.)

1.  Legal Standard

When determining disability, the ALJ is required to consider a claimant's subjective symptoms at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(a), (d). In deciding whether to accept a claimant's subjective symptom testimony, the ALJ must perform a two-step analysis. *Smolen*, 80 F.3d at 1281. First, the ALJ must assess "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if the first test is met and there is no evidence of malingering, "the ALJ can only reject the claimant's testimony about the severity of the

---

[8] While documentation regarding hospitalizations may be relevant, "hospitalization is not a requirement to satisfy Paragraph C." *Needham v. Berryhill*, No. 18-CV-04183-PJH, 2019 WL 5626641, at *19 n.7 (N.D. Cal. Oct. 31, 2019).

22-cv-00257-BEN-JLB

symptoms if [he] gives 'specific, clear and convincing reasons' for the rejection." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quoting *Lingenfelter*, 504 F.3d at 1036). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493–94 (9th Cir. 2015) ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining it.") (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)); *see also Burrell v. Colvin*, 775 F.3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the claimant's testimony and did not make "a specific finding linking a lack of medical records to [the claimant's] testimony").

The ALJ is responsible for "determin[ing] credibility, resolv[ing] conflicts in the testimony, and resolv[ing] ambiguities in the record." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014); *see also* 42 U.S.C. § 405(g) (directing that the Commissioner's "findings . . . as to any fact, if supported by substantial evidence, shall be conclusive"). In assessing a claimant's credibility, the ALJ may consider, *inter alia*, (1) inconsistencies in the claimant's testimony or between her testimony and her conduct; (2) the claimant's daily living activities; (3) the claimant's work record; and (4) testimony from physicians or third parties concerning the nature, severity, and effect of the claimant's condition. *Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002)[9]; *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (listing factors) (citation omitted).

---

[9] The Court in *Thomas* also included the claimant's reputation for truthfulness as a consideration, but the SSA has since clarified that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to engage in second-guessing. *See Thomas*, 278 F.3d at 959 (citation omitted); *see also Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). However, "[i]f the ALJ fails to specify his or her reasons for finding claimant testimony not credible, a reviewing court will be unable to review those reasons meaningfully without improperly 'substitut[ing] [its] conclusions for the ALJ's, or speculat[ing] as to the grounds for the ALJ's conclusions.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1103). Because reviewing courts "cannot engage in such substitution or speculation, such error will usually not be harmless." *Id.* But the ALJ's reliance on other possibly erroneous credibility findings is harmless if the ALJ's conclusion on credibility is supported by other substantial evidence. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1162–63 (9th Cir. 2008).

### 2.   ALJ's Decision

In his decision, the ALJ found that Plaintiff's medically determinable mental impairments of bipolar disorder, anxiety, and depression could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (AR 19.) The ALJ provided the following reasons for discounting Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms related to her mental impairments: (1) inconsistency with the medical evidence; (2) her activities of daily living suggest a "robust life style"; and (3) Plaintiff's own inconsistent statements. (AR 20–21.)

---

Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304, at *11 (Oct. 25, 2017); *accord Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017).

Specifically, the ALJ stated the following with respect to Plaintiff's mental impairments:

> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent with the medical evidence.
>
> . . .
>
> Mentally, the claimant attended Psychiatric Centers for bipolar, mood disorder, and ADHD (Exhibit 2F; 5F; 7F).  In February 2020, the claimant reported severe symptoms of mood change, but also controlled (Exhibit 2F/8). Mental status examination was unremarkable with normal general observation; normal appearance; normal posture; average eye contact; normal activity; cooperative attitude; depressed irritable mood; full affect; clear speech; logical thought process; normal perception; no delusions; normal cognition; average intelligence; normal insight; and normal judgment (Exhibit 2F/6 and 10).  The claimant was taking Xanax, Latuda, and Adderall (Exhibit 2F/5).
>
> Subsequent office notes continued to record normal mental status examination (Exhibit 5F/75, 71, 66, 63, 60, 56, 52, 47, 43, 39, 27, 23, 14, 10; 7F/117, 113, 109, 102, 99, 95, 91, 88, 84, 80, 76, 71, 68, 64, 59, 51, 47, 43, 36, 32, 28, 23, 19, 15, 11, 7, 2).  In March 2020, the claimant was debating going back to work for the purpose of getting the custody of her children (Exhibit 5F/75). In April 2020, the claimant reported she was "doing well" (Exhibit 5F/50), and in May 2020, the claimant stated her mood has been stable [and] much improved on medications Latuda and Lamictal (Exhibit 5F/30).  On June 20, 2020, the claimant informed her therapist, Heidi Hokaj, MFT, that she has been jogging and exercising, has been physically active, helped put gravel down in yard, and planning to go back to work in August (Exhibit 5F/11; 7F/106, 102).  Mood was good for the most part in November 2020 (Exhibit 7F/59).  In December 2020, the claimant reported she had a methamphetamine relapse (Exhibit 7F/47).
>
> Despite the claimant's allegation of disability and severe symptoms, the claimant reported robust life style.  *E.g.*, she is still able to go on boat trip and looking forward to the time away (Exhibit 7F/102); went to Las Vegas and got married (Exhibit 2F/23); driven to Mexico for the day with some friends (Exhibit 2F/14); started working and everything went smoothly (Exhibit 7F/99); working a lot in September 2020 (Exhibit 7F/80); working is going well (Exhibit 7F/74, 59); go out for birthday and going hiking (Exhibit 7F/55); working a lot in January 2021 (Exhibit 7F/19).

Most recently, on February 10, 2021, the claimant stated she had a rough day the day before and had 3 panic attacks, which got better after taking Cymbalta (Exhibit 7F/2).  The claimant was taking Xanax, Latuda, Lamictal, Cymbalta, and Adderall.  However, mental status examination was normal (Exhibit 7F/2).

In terms of the claimant's allegations, they are [in]consistent.[10]  . . . [T]he claimant testified that she has not worked since August 2019 due to bipolar disorder (Testimony).  However, she also testified that in addition to her 17 month old baby, she and her husband recently acquired custody of his two kids, who are no[w] living with them.  According to the psychiatric treatment notes, except depressed mood, mental status examination was within normal [range] (Exhibit 2F/6, 10; 5F/75, 71, 66, 63, 60, 56, 52, 47, 43, 39, 27, 23, 14, 10; 7F/117, 113, 109, 102, 99, 95, 91, 88, 84, 80, 76, 71, 68, 64, 59, 51, 47, 43, 36, 32, 28, 23, 19, 15, 11, 7, 2).  Moreover, the therapist also commented that the claimant went back to work in August 2020 and that she reported working is going well (Exhibit 7F/99, 80, 74, 59, and 19).  The claimant was working a lot in January 2021 (Exhibit 7F/19) and that her paycheck was higher than her husband's and talked about spelling things out for boss regarding what she wants her schedule to be (Exhibit 7F/15).  The therapy notes conveyed that the claimant works at a group home, which required her to spend the night there twice a week, where she cooks for the residents, interacts with them, and cleans the facility, etc.  Therefore, I find these notes contradict the claimant's testimony.

(AR 19–21.)

Because the ALJ did not find any evidence of malingering, the ALJ could only reject Plaintiff's testimony about the severity of her symptoms by giving "specific, clear, and convincing reasons" supported by substantial evidence for the rejection.  *See Vasquez*, 572 F.3d at 591.  The Court will address each of the reasons given by the ALJ below.

### 3.   Analysis

#### a.   *Inconsistency with the Medical Evidence*

The first reason the ALJ gave for discrediting Plaintiff's symptom testimony was that her statements regarding her mental impairments were "inconsistent with the medical

---

[10]   Although the ALJ used "consistent," it is clear from the context of the statement that he meant to state "inconsistent."

evidence." (AR 19.) The ALJ cited a February 2020 treatment note in which Plaintiff reported that her symptoms were "severe" but also "controlled." (AR 20 (citing Ex. 2F/8).) Plaintiff's mental status examinations were also noted to be normal and unremarkable. (AR 20 (citing Ex. 2F/6 and 10).) The ALJ further cited subsequent office notes which continued to record "normal mental status examination[s]." (AR 20 (citing Ex. 5F/75, 71, 66, 63, 60, 56, 52, 47, 43, 39, 27, 23, 14, 10; 7F/117, 113, 109, 102, 99, 95, 91, 88, 84, 80, 76, 71, 68, 64, 59, 51, 47, 43, 36, 32, 28, 23, 19, 15, 11, 7, 2).) The ALJ also highlighted various treatment notes between March 2020 and November 2020 in which Plaintiff reported that she was "doing well," her mood was "stable" and "much improved on medications Latuda and Lamictal," and that she was planning on going back to work. (AR 20 (citing Ex. 5F/75, 50, 30, 11, Ex. 7F/106, 102, 59).)

An ALJ may consider inconsistencies between a claimant's subjective symptom testimony and the medical evidence when making a credibility determination. *See Smartt v. Kijakazi*, 53 F.4th 489, 498 (9th Cir. 2022) ("When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."); *Carmickle*, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."); 20 C.F.R. § 404.1529(c)(4) (in assessing symptom testimony, ALJs will consider "inconsistencies in the evidence and the extent to which there are conflicts between [the claimant's] statements and the rest of the evidence"). However, "[o]nce the claimant produces medical evidence of an underlying impairment, the [ALJ] may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence." *Reddick*, 157 F.3d at 722. After a review of the record in this case, the Court finds that inconsistency with the medical records was not a clear and convincing reason supported by substantial evidence in the record for discounting the severity of Plaintiff's symptom testimony.

A close review of the treatment notes to which the ALJ cited as evidence of the inconsistency between Plaintiff's testimony and the medical records ultimately undermines

his conclusion.  For example, in the February 2020 treatment notes cited by the ALJ, Plaintiff did report that her mood changes were "controlled," but she also reported they were "chronic," "severe," and "occur randomly."  (AR 20 (citing Ex. 2F/8 (AR 379)).)  On February 10, despite a normal mental examination, Plaintiff reported being "really emotional" and "[n]ot feeling like herself," with her mood "all over the place."  (AR 377, 379.)  She stated that the medication Vraylar was "partially effective," and she was "unable to function with her mood."  (AR 379.)  Plaintiff further reported that her relationship was "going well" with her husband on February 10, but she had a very bad fight with him in which she pushed him and called him names four days later.  (AR 379, 377.)  On February 14, her therapist assessed her mood as "[d]epressed irritable."  (AR 377.)  The ALJ suggested that these treatment notes indicate Plaintiff's severe mood changes were controlled; yet a review of the entire treatment notes indicates otherwise.  "[T]reatment records must be viewed in light of the overall diagnostic record."  *Ghanim*, 763 F.3d at 1164.

The ALJ further cited a long list of treatment notes indicating "normal mental status examination[s]."  (AR 20.)  Indeed, under the "General Observations" subheading, Therapist Hokaj or Dr. Patel consistently recorded "Generally normal."  (*E.g.*, AR 925, 929, 933, 1066, 1082.)  Yet, under the "Mental Status" subheading of these same notes, Therapist Hokaj or Dr. Patel regularly recorded Plaintiff's mood as irritable, restless, anxious, depressed, and/or angry.  (*See e.g.*, June 2020 treatment notes at AR 921, 925, 929, 933, 938.)  The notes also reflect that Plaintiff reported her "moods are fluctuating constantly and like she is a light switch turning off and on."  (AR 934.)  Plaintiff missed one appointment in June 2020 because she was "in a bad space."  (AR 933.)  On June 1, 2020, Plaintiff reported that her mood was "erratic," and she had "poorly controlled" symptoms and an inability to regulate her emotions.  (AR 936.)  Her mood was assessed as depressed and anxious.  (AR 938.)

Plaintiff saw a therapist at Psychiatric Centers at San Diego approximately five times per month between March 2020 and February 2021.  (AR 916–991 (Ex. 5F), AR 1024–

1142 (Ex. 7F).)  Plaintiff's mood was subject to fluctuation throughout this period.  For example, on April 18, 2020, Plaintiff was assessed with a depressed, anxious, and irritable mood, flat affect, and slow speech.  (AR 958.)  However, a week later, on April 24, 2020, Plaintiff was assessed with a euthymic mood, full affect, and clear speech.  (AR 954.)  The ALJ cited both notes as evidence of "normal mental examination[s]."  (AR 20.)

On August 1, 2020, Plaintiff was assessed as having an anxious, irritable, and restless mood and reported that her "moods are up and down, not stable or constant."  (AR 1118.)  On November 5, 2020, Plaintiff noted that her moods were "good for the most part," but believed she was "in more of an up mode at the moment."  (AR 1082.)  In the final treatment note, dated February 11, 2021, Plaintiff's assessed mood was depressed and anxious and she reported three panic attacks the day before and needing "4 Xanax in order for it to work."  (AR 1025.)

The ALJ further cited a March 7, 2020, treatment note in which Plaintiff reported that she was debating going back to work, thus suggesting her moods were stabilizing.  (AR 20 (citing Ex. 5F/75 (AR 990)).)  One week later, however, Plaintiff reported that she would not be going back to work at that time because she felt like her "moods [we]ren't consistent enough at th[at] point."  (AR 982.)  Plaintiff did start working in or around July/August 2020.  (AR 1125.)  She worked approximately three to four nights per week.  (AR 1042, 1144, 1122.)  However, in February 2021, Plaintiff took a leave of absence from work because she was "feeling overwhelmed."  (AR 1034.)[11]

As the Ninth Circuit has stressed, in addressing "mental health issues, it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence,

---

[11]     In his decision, the ALJ noted Plaintiff's panic attacks on February 10, 2021, but added that Plaintiff's mental status examination was normal on February 11, 2021.  (AR 20.)  This was not correct, however, as Therapist Hokaj assessed Plaintiff's mood as depressed and anxious during her February 11 visit.  (AR 1025.)

and in such circumstances, it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017.  When dealing specifically with bipolar disorder, ALJs must consider that bipolar disorder is "notably episodic and does not manifest every day." *Smith v. Saul*, 820 F. App'x 582, 585 (9th Cir. 2020); *Winter v. Berryhill*, 711 F. App'x 847, 850 (9th Cir. 2017) ("periodic mood and emotional swings [are] characteristic of bipolar disorder").  Here, the treatment notes do not reflect that Plaintiff's severe mood swings are sufficiently and consistently controlled such that record evidence of short periods of relative stability are necessarily inconsistent with Plaintiff's symptom testimony.  A review of the entire record, including the treatment notes cited by the ALJ, indicates that Plaintiff's moods fluctuated frequently, as is characteristic of bipolar disorder, despite regular treatment and medication.

For the foregoing reasons, the Court finds this was not a clear and convincing reason supported by substantial evidence for rejecting Plaintiff's symptom testimony.

### b.   *Daily Activities*

The second reason the ALJ gave for discrediting Plaintiff's symptom testimony was Plaintiff's reportedly "robust" lifestyle.  (AR 20.)  The ALJ pointed to notes reflecting that Plaintiff "is still able to go on [a] boat trip and [was] looking forward to the time away" (AR 20 (citing Ex. 7F/102).)  The ALJ further pointed to Plaintiff's trip to Las Vegas to get married, a day trip to Mexico with friends, and a birthday outing and hiking as evidence of her robust lifestyle.  (AR 20 (citing Ex. 2F/23, 14; Ex. 7F/55).)  The ALJ also cited to evidence of Plaintiff working and that work had been going well.  (AR 20 (citing Ex. 7F/99, 80, 74, 59, 19).)

"Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." *Ghanim*, 763 F.3d at 1165; *see also Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("[I]nconsistent daily activities may provide a justification for rejecting symptom testimony[.]"); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (stating that a contradiction between a claimant's daily activities

and his or her testimony is a ground for forming the basis of an adverse credibility determination). In other words, a court may consider inconsistencies between a claimant's words and her actions. *See Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989); *see also Reddick*, 157 F.3d at 722 ("Only if the level of activity were inconsistent with Claimant's claimed limitations would these activities have any bearing on Claimant's credibility.").

However, "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001). "A claimant 'does not need to be utterly incapacitated in order to be disabled.'" *Revels*, 874 F.3d at 667 (quoting *Vertigan*, 260 F.3d at 1050).

Daily activities may also "be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair*, 885 F.2d at 603). To meet this standard, the ALJ "must make 'specific findings relating to [the daily] activities' and their transferability to a work setting to conclude that a claimant's daily activities warrant an adverse credibility determination." *Id.* (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

As evidence of Plaintiff's "robust" lifestyle, the ALJ pointed to various treatment notes. On January 10, 2020, Plaintiff reported to Therapist Hokaj that she had gotten married in Las Vegas a "couple of weeks ago." (AR 394.) On February 7, 2020, Plaintiff reported to Therapist Hokaj that she went down to Mexico for the day with some friends over the weekend and she was "overall doing well" with "no drama in her world." (AR 385.) On July 18, 2020, Plaintiff reported to Therapist Hokaj that she had anxiety about starting work on Monday due to the "virus" but was "still able to go on a boat trip and [was] looking forward to the time away." (AR 1125.) On November 19, 2020, Plaintiff reported to Therapist Hokaj celebrating her husband's birthday the day before and having plans to go out again on Saturday. (AR 1078.) His kids were around, so she took them hiking. (AR 1078.)

1    The Court finds that the ALJ properly relied on the foregoing activities to support

2    an adverse credibility finding.  As the ALJ noted, Plaintiff "asserts she cannot get out of

3    bed at times and that she has a problem . . . getting along with others due to mood swings

4    and anger."  (AR 19.)[12]  The records of Plaintiff's activities undercut Plaintiff's testimony

5    as to the severity of her symptoms.

6    The ALJ also pointed to Plaintiff's ability to work as evidence of her "robust"

7    lifestyle.  (AR 20.)  "An ALJ may properly consider a claimant's work record when

8    weighing a claimant's credibility."  *Lake v. Berryhill*, No. 3:16-cv-03021-GPC-JMA, 2018

9    WL 1466407, at *11 (S.D. Cal. Mar. 26, 2018) (citing *Light v. Soc. Sec. Admin.*, 119 F.3d

10   789, 792 (9th Cir. 1997)), *aff'd sub nom. Lake v. Saul*, 778 F. App'x 536 (9th Cir. 2019).

11   However, the fact that a claimant tries to work, but fails to maintain substantial gainful

12   employment, may weigh in favor of disability.  *Lingenfelter*, 504 F.3d at1038 (finding the

13   fact the claimant worked for a brief period of time to not be a clear and convincing reason

14   for rejecting the claimant's subjective symptom testimony).

15   During the hearing, Plaintiff testified that she has had mental health issues since she

16   was 15 years old.  (AR 38.)  However, because of her illness, she claimed she has been

17   fired or laid off from almost every job she has ever had.  (AR 185.)  The record indicates

18   that Plaintiff reported being on disability in 2013 and 2015, at least in part due to her mental

19   impairments.  (*See* AR 731, 743, 864–65.)  Plaintiff reported going on disability[13] again in

20   or around August 2019 after the birth of her second child.  (AR 396, 399, 401, 452, 454.)[14]

---

[12]    Plaintiff testified that when she is depressed it is "very, very hard" to get out of bed, she cannot think straight, she wants to sleep all day, she mopes around, she is in her head too much, her mind races, and she cries all the time.  (AR 43–44.)  She further testified that she is "normally depressed" and does not "really have a lot of manic."  (AR 43.)

[13]    Although unclear from the record, it appears that Plaintiff was on state disability or unemployment.  (*See* AR 463 (8/9/19 – "planning to apply for unemployment").)

[14]    Plaintiff gave birth to her second child on August 15, 2019, five days after her alleged onset date.  (AR 17, 454.)  Plaintiff reported to the SSA in January 2020 that

31

Although in March 2020, Plaintiff debated going back to work because her new medication was helping (AR 990), a week later, Plaintiff decided not to go back to work because she did not feel like her moods were consistent enough (AR 982). Plaintiff did go back to work in or around July/August 2020, but her moods were "all over the place." (*See* AR 1072, 1082, 1118, 1122–25.) Plaintiff continued to work into early 2021. However, she took a leave of absence starting on or around February 6, 2021, because she was feeling overwhelmed. (AR 1034.)

Overall, the record demonstrates that Plaintiff has not consistently sustained employment as an adult. However, she has been able to work for substantial periods of time and, as noted by the ALJ, Plaintiff was able to work full time for approximately six months in 2020 and 2021 after her alleged onset date and reported that it went well. (*See* AR 20 (citing Ex. 7F/99 (AR 1122) (7/24/20—"started work this week, everything went smoothly")); 7F/80 (AR 1103) (9/24/20—"working a lot—has Wed and Sat shift, enjoying the time there"); 7F/74 (AR 1097) (9/28/20—"she is back to work and doing really well")); 7F/59 (AR 1082) (11/5/20—"work is going well, boss is giving her extra shifts")); 7F/19 (AR 1042) (1/21/21—"working a lot next week – has 4 over nights coming up")).)

Plaintiff's work after her alleged onset date included at least two overnight shifts per week, one 31-hour shift and one 19-hour shift (for a total of 50 hours), and required her to cook for the residents, interact with them, and clean the facility. (AR 21, 34.) As the ALJ pointed out, Plaintiff's treatment notes in January 2021 also indicated that Plaintiff's paycheck was higher than her husband's paycheck at that point and she was able to spell things out for her boss regarding what she wanted her schedule to look like. (AR 21 (citing Ex. 7F/15.) Subsequent treatment notes indicated that Plaintiff took a leave of absence from work starting on February 6, 2021, shortly before the administrative hearing, due to

---

Dr. Patel had become concerned enough about Plaintiff's mental health that he recommended she file for disability. (AR 171.)

feeling overwhelmed with three kids[15] and issues with her husband and her work schedule, but not specifically because of her mental impairments.[16]  (AR 1034.)  Accordingly, the Court finds that the ALJ reasonably relied on Plaintiff's ability to work substantial hours after her alleged onset date to undercut Plaintiff's testimony that she could not work.

For the foregoing reasons, the Court finds that Plaintiff's "robust" lifestyle was a clear and convincing reason for rejecting Plaintiff's symptom testimony.

### c.  *Contradictory Statements*

The last reason the ALJ gave for discrediting Plaintiff's symptom testimony was that her statements were inconsistent with the record.  (AR 20.)  The ALJ pointed to various treatment notes which he found "contradict [Plaintiff's] testimony."  (AR 21.)  An ALJ may consider inconsistencies in a claimant's testimony in assessing credibility.  *Thomas*, 278 F.3d at 958; *but see Trevizo*, 871 F.3d at 678 n.5 ("[A]ssessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." (quoting SSR 16-3p, 2017 WL 5180304, at *1)).

The ALJ first cited to a treatment note in June 2020 that indicated Plaintiff had been physically active, jogging and exercising, and helped her husband put gravel down in the yard.  (AR 21 (citing 5F/11).)  During the hearing, the ALJ mentioned this note and Plaintiff stated in response to being asked about the gravel, "What?  I've never done that.  My

---

[15]   Plaintiff's husband obtained full custody of his two kids in or around January 2021.  (*See* AR 1041–43 (1/21/21—Plaintiff's husband just obtained full custody of his kids); AR 32 (3/3/21—"we just got full custody of my husband's two children").)

[16]   Furthermore, although Plaintiff ultimately left this employment after approximately six months, the Court notes that this previous position did not meet the RFC limitations the ALJ determined for Plaintiff.  (*See* AR 22 (finding at Step Four that Plaintiff is unable to perform any past relevant work).)

husband does that." (AR 40.)  The ALJ also asked Plaintiff if she was still exercising and jogging.  (AR 40.)  Plaintiff replied that she could not jog due to an ankle injury when she was a teenager, but she would walk her dog.  (AR 40.)  The Court finds that the ALJ reasonably determined that Plaintiff's hearing testimony was inconsistent with the record, but this inconsistency only has bearing on Plaintiff's claimed physical limitations due to her low back pain and not her mental impairments.

Next, the ALJ cited Plaintiff's testimony that she relapsed only once on methamphetamine, which the ALJ found contradicted Plaintiff's treatment notes and her pre-hearing brief, which indicated Plaintiff "uses methamphetamine when she gets manic." (AR 21 (citing Ex. 7F/47, 49; 22E/3).)  During the hearing, Plaintiff explained that she took methamphetamine on November 23, 2020, and then called her sponsor, but she had "not had a problem prior." (AR 33.)  In apparent contradiction, Plaintiff's treatment notes stated that she was "aware that using meth puts her into a manic state," and her pre-hearing brief stated, "Claimant will testify that the only time she will use meth is when she is manic." (AR 261, 1070.)  The Court finds that the ALJ reasonably determined that Plaintiff's claim of only a single methamphetamine relapse contradicts the identified record evidence. Moreover, the Court finds that the inconsistency has bearing on Plaintiff's claimed mental limitations.

The ALJ further cited Plaintiff's testimony that "she has not worked since August 2019 due to bipolar disorder" and contrasted this with her ability to take care of three children— her 17-month-old[17] and her husband's two kids (10 and 7 years old).  (AR 21; *see also* AR 22 ("[T]he treating notes documented the claimant was fully functioning at work and with mothering.").)  As discussed above, Plaintiff testified that she went back to work in July/August 2020 and continued working through early February 2021.  (AR 34,

_____

[17]  Plaintiff also has a seven-year-old son, but Plaintiff testified that he lives with his father in Nevada.  (AR 32.)

50.)[18]   During most of this time, she only had her 17-month-old son full time, but shortly before Plaintiff stopped working, in January 2021, Plaintiff's husband got full custody of his two children as well.  (*See* AR 1041–43.)  The ALJ did not err in concluding that Plaintiff's testimony that "she has not worked since August 2019 due to bipolar disorder" was inconsistent with the evidence that she was fully functioning at work with one young child prior to February 2021 and was fully functioning as a parent of three young children thereafter.

Overall, the Court finds that certain of the ALJ's credibility determinations are supported by substantial evidence in the record.  Any error with respect to some of the reasons articulated by the ALJ is therefore harmless.  *See Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not negate the validity of the ALJ's ultimate [credibility] conclusion, such is deemed harmless and does not warrant reversal." (internal quotation marks omitted)); *Batson*, 359 F.3d at 1197 (finding that although the ALJ erred in relying on one of several reasons in support of an adverse credibility determination, such error did not affect the ALJ's decision, and therefore was harmless, because the ALJ's remaining reasoning and ultimate credibility determination were adequately supported by substantial evidence in the record).

Plaintiff testified that she frequently cannot get out of bed and cannot work due to her mental impairments.  She further testified that her mental impairments affect her ability to get along with others.  However, as pointed out by the ALJ, Plaintiff has engaged in a "robust lifestyle," which includes getting away with friends and family and being physically active, and she has demonstrated an ability to work full-time and parent three young children despite her symptoms.  These activities belie the alleged severity of

---

[18]   Plaintiff submitted paperwork to the SSA in December 2020, which stated she was still working as a caregiver, consistent with her testimony.  (AR 240, 246, 250.)

Plaintiff's symptoms.  Accordingly, the Court finds that the ALJ did not err in discounting Plaintiff's subjective symptom testimony.

### C.    The ALJ Did Not Err in Assessing the "Paragraph B" Criteria

#### 1.    Parties' Arguments

Plaintiff argues that the ALJ erred in determining that Plaintiff did not meet the "paragraph B" criteria.  (ECF No. 18-1 at 12–13.)  Plaintiff argues that "the ALJ cannot cherry pick through the record to establish the 'B' criteria." (*Id.* at 13.)  In response, the Commissioner argues that the ALJ properly found that Plaintiff did not meet a listed impairment.  (ECF No. 20 at 12.)

#### 2.    Legal Standard

At Step Three, the ALJ determines whether the claimant's mental impairment "meets or equals one of [the SSA's] listings in appendix 1 . . . and meets the duration requirement"; if it does meet these requirements, the Commissioner will find the claimant disabled.  20 C.F.R. § 404.1520(a)(4)(iii).  For the relevant listings, in determining whether a claimant with a mental impairment meets a listed impairment, the Commissioner considers whether medical documentation satisfies the requirements of (1) "paragraph A" and "paragraph B"; or (2) "paragraph A" and "paragraph C".  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

To meet the "paragraph B" criteria, Plaintiff must have extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  *Id.*  The "Paragraph B" criteria "represent the areas of mental functioning a person uses in a work setting."  *Id.* at § 12.00(A)(2)(b).

#### 3.    Analysis

With respect to the "paragraph B" criteria, the ALJ relied on the opinions of the State Agency consultative examiners who opined that Plaintiff had only mild and moderate limitations, as well as on Plaintiff's "essentially normal mental status examination and generally normal activities of daily living."  (AR 18.)  Because he found that Plaintiff's

mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the ALJ determined that the "paragraph B" criteria were not satisfied.  (AR 18.)

In assessing the "paragraph B" criteria, the ALJ permissibly relied on the uncontested opinions of the State Agency consultative examiners, whose opinions he found persuasive.  *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("[R]eports of the nonexamining advisor . . . may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it."); *Magallanes v. Bowen*, 881 F.2d 747, 752–53 (9th Cir. 1989) (stating that "the reports of consultative physicians called in by the Secretary may serve as substantial evidence" where they are consistent with other evidence in the record).  Here, the State Agency consultative examiners did not opine that Plaintiff had more than moderate limitations in the "paragraph B" criteria and their opinions were consistent with and supported by other evidence in the record.  (AR 58–61, 71–73.)  Although the State Agency consultative examiners did not review all of Plaintiff's medical records, the records that post-date their opinions are consistent with those that they reviewed.  For the reasons discussed above, the ALJ also permissibly relied on Plaintiff's generally normal activities of daily living.

Although Plaintiff argues that the ALJ engaged in cherry picking, she does not identify specific parts of the record that indicate Plaintiff is more than moderately limited in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself, or mildly limited in her ability to understand, remember, or apply information.  Moreover, after a review of the entire record, the Court finds that the ALJ's determination was reasonable and supported by substantial evidence in the record.  Accordingly, the Court finds that the ALJ did not err in assessing the "paragraph B" criteria.

### D.   The ALJ Did Not Err in Assessing the "Paragraph C" Criteria

#### 1.   Parties' Arguments

Plaintiff argues that Plaintiff meets the "paragraph C" criteria.  (ECF No. 18-1 at 8, 10–11.)  In response, the Commissioner argues that the ALJ properly found that Plaintiff

did not meet a listed impairment. (ECF No. 20 at 12.) The Commissioner further argues that the record did not evidence any psychiatric hospitalizations during the alleged disability period (August 20, 2019, to March 12, 2021) sufficient to satisfy the "paragraph C" criteria. (*Id.* at 13 n.6.)

### 2. Legal Standard

At Step Three, the ALJ determines whether the claimant's mental impairment "meets or equals one of [the SSA's] listings in appendix 1 . . . and meets the duration requirement"; if it does meet these requirements, the Commissioner will find the claimant disabled. 20 C.F.R. § 404.1520(a)(4)(iii). For the relevant listings, in determining whether a claimant with a mental impairment meets a listed impairment, the Commissioner considers whether medical documentation satisfies the requirements of (1) "paragraph A" and "paragraph B"; or (2) "paragraph A" and "paragraph C". *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06.

To meet the "paragraph C" criteria, Plaintiff's mental disorder must be "serious and persistent," which is defined as "a medically documented history of the existence of the disorder over a period of at least 2 years" with evidence of both: (C1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder"; and (C2) "[m]arginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *Id.*

The first criterion is satisfied when the evidence shows that the claimant relies "on an ongoing basis, upon medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), to diminish the symptoms and signs of [the claimant's] mental disorder." *Id.* at § 12.00(G)(2)(b). A claimant receives "ongoing medical treatment when the medical evidence establishes that [the claimant] obtain[s] medical treatment with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for [the claimant's] medical condition." *Id.*

The second criterion is satisfied "when the evidence shows that, despite [the claimant's] diminished symptoms and signs, [the claimant] ha[s] achieved only marginal adjustment."  *Id.* at § 12.00(G)(2)(c).  "Marginal adjustment" means that the claimant's "adaptation to the requirements of daily life is fragile; that is, [the claimant] ha[s] minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life."  *Id.*  The SSA will consider that claimant has "achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of [the claimant's] symptoms and signs and to deterioration in [the claimant's] functioning; for example, [the claimant] ha[s] become unable to function outside of [her] home or a more restrictive setting, without substantial psychosocial supports."  *Id.*  "Such deterioration may have necessitated a significant change in medication or other treatment."  *Id.*  "Similarly, because of the nature of [the claimant's] mental disorder, evidence may document episodes of deterioration that have required [the claimant] to be hospitalized or absent from work, making it difficult for [the claimant] to sustain work activity over time."  *Id.*

In determining whether a claimant equals a listing under at Step Three, "the ALJ must explain adequately his evaluation of alternative tests and the combined effects of the impairments."  *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).

### 3.   Analysis

Here, the ALJ determined at Step Three that Plaintiff's severe mental impairments of bipolar disorder and ADHD did not meet or medically equal the criteria of listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  (AR 17–18.)

With respect to the "paragraph C" criteria, the ALJ stated:

I have also considered whether the "paragraph C" criteria are satisfied.  In this case, the evidence fails to establish the presence of the "paragraph C" criteria. There is no evidence of serious and persistent mental disorder, which was documented over a period of at least 2 years with evidence of both: medical treatment, mental health therapy, psychosocial supports, or a highly structured

setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b) and marginal adjustment, that is, the claimant has minimal capacity to adapt to changes in his/her environment or to demands that are not already part of his/her daily life.  Accordingly, the evidence fails to establish the presence of the paragraph "C" criteria.

(AR 18.)

The ALJ's "paragraph C" evaluation at Step Three in the decision is insufficient to inform the Court which of the C1 or C2 criteria the ALJ concluded was not met, and why. The ALJ merely repeated the legal standard without any analysis.  However, an "ALJ can evaluate the medical record in a separate section before concluding whether a [claimant] meets the Paragraph C requirements." *Needham*, 2019 WL 5626641, at *19 (citing *Lewis v. Apfel*, 236 F.3d 503, 513 (9th Cir. 2001)).  The Court finds that the ALJ permissibly did so here.

Because satisfaction of the "paragraph C" criterion requires that both C1 and C2 are satisfied, the Court focuses here on C2.  Although the ALJ did not specifically identify why Plaintiff failed to meet C2 in his "paragraph C" analysis, a review of the entire decision, including the ALJ's evaluation of the "paragraph B" criteria, fairly suggests that the ALJ relied on Plaintiff's "essentially normal mental status examination[s] and generally normal activities of daily living" and the opinions of the State Agency consultative examiners to find that Plaintiff had achieved more than marginal adjustment.  (AR 18.)

For the reasons set forth above, the ALJ was entitled to rely on Plaintiff's generally normal activities of daily living and the uncontested opinions of the State Agency consultative examiners, which the ALJ found persuasive. *See Andrews*, 53 F.3d at 1041.

Overall, after review of the entire record, the Court finds that the ALJ's determination that Plaintiff had achieved more than marginal adjustment was reasonable and supported by substantial evidence in the record.  Accordingly, the Court finds that the ALJ did not err in assessing the "paragraph C" criteria.

///

///

**E.     The ALJ Committed Harmless Error in Assessing Plaintiff's RFC**

      1.   <u>Parties' Arguments</u>

Plaintiff argues that the ALJ did not adequately assess Plaintiff's RFC because he improperly rejected Plaintiff's testimony.  (ECF No. 18-1 at 13–14.)  Plaintiff further appears to argue that the ALJ failed to properly account for Plaintiff's moderate limitations in maintaining concentration, persistence, or pace.  (*Id.* at 14.)  The VE testified that a person with Plaintiff's RFC who "would be off task more than 15% of the day due to inability to maintain concentration, persistence, or pace" would be precluded from any work.  (*Id.* (citing AR 47–48).)  The Commissioner argues that the ALJ properly evaluated Plaintiff's RFC.  (ECF No. 20 at 6–13.)

      2.   <u>Legal Standard</u>

A claimant's RFC "is the most [a claimant] can do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1); *see also Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) ("The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, . . . may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.").  The ALJ is "responsible for assessing [the RFC]." 20 C.F.R. § 404.1546(c).  Specifically, it is an ALJ's responsibility to translate medical opinions into concrete, functional limitations.  *See* 20 C.F.R. § 404.1527(d)(2); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015) ("[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC.").  The ALJ must determine a claimant's RFC "based on all of the relevant medical and other evidence," and will consider "any statements about what [the claimant] can still do that have been provided by medical sources" and "descriptions and observations of [the claimant's] limitations" provided by the claimant and other non-medical sources.  20 C.F.R. § 404.1545(3); *Laborin*, 867 F.3d at 1153.

The ALJ need only consider those limitations supported by the record and need not take into account properly rejected evidence or subjective complaints. *See Bayliss*, 427

F.3d at 1217 (upholding ALJ's RFC because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant]'s subjective complaints"). A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision. *Id.*

At Step Five, the ALJ may pose hypothetical questions to a VE as to: (1) jobs the claimant, given her RFC, could perform; and (2) the availability of such jobs in the national economy. *Tackett*, 180 F.3d at 1101. A hypothetical question posed to the VE must include all the claimant's limitations supported by substantial evidence. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). When a hypothetical question includes all the claimant's credible functional limitations, both physical and mental, an ALJ is generally entitled to rely upon the VE's response to it. *See Thomas*, 278 F.3d at 956; *see also Osenbrock v. Apfel*, 240 F.3d 1157, 1164–65 (9th Cir. 2001) (observing that hypothetical questions posed to VE must include all impairments supported by substantial evidence); *Andrews v. Shalala*, 53 F.3d 1035, 1044 (9th Cir. 1995) (holding reliance on hypothetical question that fails to include all accepted limitations is insufficient to carry burden at step five of proving ability to engage in alternative work).

### 3.   Analysis

The ALJ determined that Plaintiff has the RFC to perform medium work involving routine, noncomplex tasks, with occasional interaction with the public. (AR 19.) The ALJ assessed Plaintiff's RFC based on all the relevant medical and other evidence in the record, including medical opinion evidence and Plaintiff's subjective symptom testimony and relevant lay testimony. (AR 19–22.) The ALJ need only consider those limitations supported by the record and need not take into account properly rejected evidence or subjective complaints. *See Bayliss*, 427 F.3d at 1217. Other than the arguments addressed and rejected above, Plaintiff does not point to any evidence in the record that the ALJ improperly failed to consider and assess.

///

The ALJ found the opinions of the State Agency consultative examiners to be persuasive, as they were supported by the treating notes and consistent with the medical evidence. (AR 21.)  Reports of non-examining advisors may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it.  *See Andrews*, 53 F.3d at 1041.  As discussed above, the opinions of the State Agency consultative examiners are supported by other evidence in the record and are consistent with it.

Dr. Rivera-Miya opined that Plaintiff is "capable of carrying out simple one to t[wo] step tasks in a routine work environment with no more than occasional contact with the general public." (AR 60.)  Dr. Rivera-Miya further opined that Plaintiff "is able to sustain at unskilled work for 40 hr/wk, work with coworker/supervisors and avoid hazards," but "would function best with limited public contact."  (AR 60.)  Dr. Rivera-Miya also concluded that, despite being "moderately limited" in concentration and persistence, Plaintiff could "sustain concentration and persistence sufficient to complete simple one to two step tasks for routine intervals in a typical work environment." (AR 59.)  Dr. Hawkins concurred with Dr. Rivera-Miya's opinions.  (AR 71–73.)

The ALJ largely incorporated the limitations assessed by the State Agency consultative examiners into Plaintiff's RFC.  However, rather than include a limitation to "simple one to t[wo] step tasks in a routine work environment," the ALJ limited Plaintiff to "routine, noncomplex" tasks. (AR 19.)  The ALJ's failure to adopt or explicitly reject the limitations assessed by the State Agency consultative examiners, whose opinions he found persuasive, constitutes error.  *See Andrade v. Comm'r of Soc. Sec.*, No. 1:22-CV-00861-EPG, 2023 WL 3601572, at \*3 (E.D. Cal. May 23, 2023) (noting "it would be error to deem an opinion persuasive but yet fail, without explanation, to omit limitations from the opinion in the RFC").  However, for the reasons set forth below, the Court finds that the error was harmless.  *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (defining harmless error as such error that is "inconsequential to the ultimate nondisability determination").

First, Plaintiff's RFC restriction to "routine, noncomplex" tasks was equivalent to the State Agency consultative examiners' limitation to "simple tasks" in a routine environment.  *See Kimberly P. v. Saul*, No. ED CV 17-2223-SP, 2019 WL 4736975, at *6 (C.D. Cal. Sept. 26, 2019) (district courts in this Circuit have determined that there is no meaningful distinction between "noncomplex" and "simple").  Furthermore, a restriction to "routine, noncomplex" tasks can adequately account for a claimant's moderate limitations in concentration, persistence, or pace.  *See, e.g.*, *Hairston v. Saul*, 827 F. App'x 772, 773 (9th Cir. 2020) (finding a limitation to "simple repetitive tasks" adequately accounted for a claimant's moderate limitations in concentration, persistence, and pace where the State Agency non-examining psychologist concluded that the claimant could perform simple, repetitive tasks despite her moderate limitations in concentration, persistence, and pace).

As for the ALJ's failure to include the State Agency consultative examiners' limitation to one- to two- step tasks in the RFC, that error is harmless because at least one of the occupations identified by the ALJ is consistent with a limitation to one- to two- step tasks and exists in substantial numbers in the national economy.  *See Rounds*, 807 F.3d at 1002 ("At Step Five, the Commissioner has the burden to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [her] identified limitations." (citations and internal quotation marks omitted)).

There are six GED Reasoning Levels that range from Level 1 (simplest) to Level 6 (most complex).  *Rounds*, 807 F.3d at 1002–03.  The lowest two levels are:

Level 1:     Apply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

Level 2:     Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.

*Id.* The occupation of Laundry Laborer, DOT 361.687-018, only requires Reasoning Level 1. Reasoning Level 1 is consistent with a limitation to one- to two- step tasks. *See Rounds*, 807 F.3d at 1003 (finding that an RFC limitation to one- and two- step tasks is consistent with Reasoning Level 1). Therefore, the ALJ's error in omitting the assessed limitation to one- to two- step tasks was harmless. *See Tara C. v. Comm'r Soc. Sec. Admin.*, No. 6:19-CV-00147-YY, 2020 WL 886297, at *5 (D. Or. Feb. 24, 2020) (finding harmless the ALJ's error in omitting a limitation to one- to two- step instructions or tasks in the RFC where the ALJ identified one job that the plaintiff could perform with Reasoning Level 1); *cf. Hernandez v. Berryhill*, 707 F. App'x 456, 459 (9th Cir. 2017) (finding harmless the ALJ's error in failing to resolve the apparent conflict between a limitation to "simple, repetitive tasks" and Reasoning Level 3 jobs where one of the jobs identified only required Reasoning Level 2, which is consistent with such limitation).

Moreover, the occupation of Laundry Laborer, DOT 361.687-018, has 823,000 jobs nationally which constitutes substantial numbers in the national economy. *See Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 jobs nationwide may constitute a significant number but is a "close call"); *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (finding 64,000 jobs nationwide to be significant). Therefore, any error in omitting this restriction from the RFC was harmless because the ALJ identified at least one job existing in substantial numbers in the national economy which Plaintiff could perform with the inclusion of this limitation. *See Rounds*, 807 F.3d at 1002.

Plaintiff makes a related argument, equally unavailing, that all three jobs identified by the VE, and incorporated into the ALJ's decision at Step Five, conflict with Plaintiff's RFC limiting her to "routine, noncomplex tasks." (ECF No. 18-1 at 14–15.) Plaintiff argues that each of the jobs identified by the ALJ require a Reasoning Level 2, which is inconsistent with simple, routine work. (*Id.* at 14.) The Court need not address whether Reasoning Level 2 is inconsistent with simple, routine work because Plaintiff's premise that all three jobs require Reasoning Level 2 is in error. As just addressed, although two of the jobs identified by the VE require Reasoning Level 2 (Cleaner, Industrial (Janitorial),

DOT 381.687-018; Laborer, Stores (Warehouse Worker), DOT 922.687-058), the job of Laundry Laborer, DOT 361.687-018 does not.

Accordingly, the Court finds that although the ALJ erred in assessing Plaintiff's RFC by failing to include the limitation to one- to two-step tasks or explain its omission, any error was harmless because it was "inconsequential to the ultimate nondisability determination." *See Stout*, 454 F.3d at 1055.

## VI.   CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court **RECOMMENDS** that Plaintiff's merits brief be **DENIED**, and that judgment be entered affirming the decision of the Commissioner.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within 14 days after being served with a copy of this Report and Recommendation.  *See* Fed. R. Civ. P. 72(b)(2).  The objections should be captioned "Objections to Report and Recommendation."  A party may respond to the other party's objections within 14 days after being served with a copy of the objections. *See id.*

**IT IS SO ORDERED.**

Dated:  July 19, 2023

Hon. Jill L. Burkhardt
United States Magistrate Judge

22-cv-00257-BEN-JLB